UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CLAIRE TENNIS ABRAMSON, Individually and as Grantor and Beneficiary of the "Indenture of Trust between Claire Tennis Abramson and Rhode Island Hospital Trust Company" | : | |
| Plaintiff | : | CA 05 021 J |
| vs. | : | C.A. No. 05- |
| BANK OF AMERICA CORP. and FLEET NATIONAL BANK | : | |
| Defendants | : | |

**COMPLAINT**

*Parties*

1. Plaintiff, Claire Tennis Abramson ("Abramson"), is a resident of Patchogue, New York.

2. Defendant Bank of America Corp. ("Bank of America") is a Delaware corporation with a principal place of business in Raleigh, North Carolina.

3. Defendant Fleet National Bank is an affiliate and/or wholly owned subsidiary of Bank of America with a principal place of business in Providence, Rhode Island.

*Jurisdiction/Venue*

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a), in that the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the plaintiff and defendants are citizens of different states.

BLISH & CAVANAGH
COUNSELLORS AT LAW
COMMERCE CENTER
30 EXCHANGE TERRACE
PROVIDENCE, RI 02903-1765
(401) 831-8900
FAX (401) 751-7542

1

5. Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(a)(2), inasmuch as the Indenture of Trust which is the subject matter of this Complaint was executed in Rhode Island, and the actions constituting the breaches of fiduciary duties, breaches of trust, and violations of law as alleged herein occurred in Rhode Island.

*Factual Allegations*

6. On or about November 28, 1958, Abramson and Rhode Island Hospital Trust Company entered into an Indenture of Trust, a true copy of which is affixed hereto as Exhibit A. On or about December 27, 1958, Abramson and Rhode Island Hospital Trust Company entered into an amendment to said Indenture of Trust, a true copy of which is affixed hereto as Exhibit B. (Hereinafter, the aforementioned Indenture of Trust and amendment are referred to collectively as the "Trust.")

7. Abramson is the grantor of the Trust and, from 1958 to date, Abramson has been the primary beneficiary of the Trust. Abramson is an unsophisticated investor who relied entirely upon the Trustees of the Trust to manage and invest the Trust assets.

8. From 1958 to approximately 1997, Rhode Island Hospital Trust Company, also or later known as Rhode Island Hospital Trust National Bank, was the Trustee of the Trust.

9. In or about 1997, Rhode Island Hospital Trust National Bank was acquired by BankBoston Corp., and BankBoston, N.A. ("BankBoston") became the Trustee of the Trust. On or about October 1, 1999, BankBoston Corp. merged with Fleet Financial Group of Massachusetts creating Fleet National Bank and a new parent organization, FleetBoston Financial Corp., and thereafter Fleet National Bank ("Fleet") became the Trustee of the Trust and, upon information and belief, assigned management of the Trust estate to its affiliate, Fleet Investment Advisors, Inc.

10. In or about April, 2004, FleetBoston Financial Corp. merged into Bank of America Corp., and Bank of America Corp. thereby acquired Fleet.

11. Section (13)1 of the Trust affords to the Trustee thereof the power, *inter alia*, "to invest and reinvest said trust estate . . . in any manner that said trustee shall deem best for the protection of any other portion of said trust estate or for the benefit of said trust estate as a whole."

12. At its inception, the Trust estate consisted, *inter alia*, of 568 shares of Northern Natural Gas stock. In or about 1980, Northern Natural Gas became known as InterNorth, and in or about 1985, InterNorth merged with Houston Natural Gas and became Enron Corporation ("Enron").

13. The Trust held stock in Enron and its predecessor corporations from 1958 until November 2001, at which time Fleet and/or Fleet Investment Advisors, Inc. sold all of the Enron shares held by the Trust.

14. Upon information and belief, in or about 1998, when BankBoston was the Trustee, it assigned its employee Paula M. Murphy ("Murphy") to manage the investment portfolio of the Trust estate. At about the time that Murphy began to manage the Trust on behalf of BankBoston, the total value of the Trust estate was approximately $957,016, there were 4,544 shares of Enron in the estate of the Trust, and those Enron shares had risen to a value of approximately $245,660, comprising approximately twenty-five and 67/100 (25.67%) percent of the estate of the Trust.

15. After Fleet became the Trustee of the Trust, Murphy became employed by Fleet Investment Advisors, Inc., and continued to manage the investment portfolio of the Trust on behalf of Fleet. Thereafter, the Enron shares split and climbed in value to a high in or about

December of 2000 of approximately $755,440, comprising over fifty-one (51%) percent of the estate of the Trust.

16. As the Enron stock began to comprise greater and greater proportions of the Trust property, Fleet failed and neglected to sell any of the Enron stock. By retaining and failing to divest the Enron stock, Fleet imprudently and improperly retained an unreasonably large proportion of the Trust property in a single security, with the effect of increasing the risk of large losses.

17. After December of 2000, the Enron stock started to decline in value, and Fleet imprudently and improperly failed and neglected to sell Enron stock as it decreased in value, and continued to fail to distribute the risk of loss by effectuating a reasonable diversification of investments in the Trust.

18. By early November of 2001, the value of the Enron shares in the Trust had decreased to approximately $80,000. By letter dated November 7, 2001, Fleet, through Murphy, for the first time wrote to Abramson, stating as follows:

> Upon review of your portfolio, I would like to suggest selling all or part of the Enron position in the [Trust]. Currently you own 9,088 shares of this security. It is trading at about $9.00 per share. We feel that Enron is a high risk situation due to its accounting issues and rumors of potential fraud. . . .
>
> Please let me know if this does not meet with your approval. If we do not hear from you we will begin reducing the Enron position in order to protect you from further downside risk.

A true copy of said letter of November 7, 2001 is affixed hereto as Exhibit C.

19. Prior to the foregoing communication from Murphy, the most recent account statement Fleet provided to Abramson was dated June 30, 2001 and indicated that the 9,088 Enron shares were valued at $446,220.80 and comprised 42.64% of the Trust estate.

20. Up until November 7, 2001, consistent with the terms of the Trust, neither Fleet nor any other former Trustee had ever sought Abramson's approval for any stock transaction in the Trust estate portfolio. Also, whereas before November, 2001, Fleet was providing Abramson with statements of her Trust account every six months, after November, 2001, Fleet began to provide Abramson with account statements each month.

21. On or about November 18, 2001, Fleet, through Murphy, advised Abramson by telephone that the Enron shares had further decreased in value, and asked Abramson what she wanted to do with the shares. Abramson replied that she was not qualified to make decisions regarding investments of the Trust estate and that it was the responsibility of the Trustee to make such investment decisions.

22. Nevertheless, in a letter dated November 21, 2001, Fleet, through Murphy, represented that Abramson had "reiterated that [she] did not wish to sell any shares of Enron Corp (sic) in [her] account," even though such statement was inconsistent with what Abramson had stated in the telephone conversation of November 18, 2001. In that same letter, Murphy stated, *inter alia*, that "we have no authority to sell securities without your formal approval," even though such statement was inconsistent with the terms of the Trust, and inconsistent with the previous actions of Fleet and/or Fleet Investment Advisors, Inc. and other Trustees of the Trust. A true copy of said letter of November 21, 2001 is affixed hereto as Exhibit D.

23. On or about November 28, 2001, Fleet, through Murphy, again asked Abramson by telephone to agree to sell the Enron stock, which by that time had decreased to $2.50 per share. Abramson again replied that the decision to sell stock in the Trust estate was that alone of the Trustee.

24 By letter dated November 29, 2001, Fleet, through Murphy, reported to Abramson that all of the Enron shares in the Trust estate were sold "for net proceeds of $7,725.00," and that the "estimated tax due on this transaction will be $1,545.00." A true copy of said letter of November 29, 2001 is affixed hereto as Exhibit E.

25. After Bank of America acquired Fleet in or about April 2004, Murphy continued to manage the Trust portfolio.

26. In addition to the failures to diversify and divest the Enron stock as aforesaid, Trustees BankBoston, Fleet, and /or Bank of America, through Murphy, failed and neglected to properly and prudently manage the Trust estate and Trust portfolio in other ways as well, including but not limited to:

a) failing and neglecting to properly invest, divest and diversify assets of the Trust other than the Enron stock, and thereby failing to properly manage the Trust. In particular, for example, the percentage of stock in Minnesota Mining and Manufacturing Co., or "3M," has been unusually and inappropriately high, having increased at times to levels in excess of 50% of the Trust assets. Also, for example, the Trust portfolio maintained an overly high percentage of stock in the communications industry;

b) imprudently maintaining large percentages of stocks in the Trust portfolio, and failing and neglecting to diversify assets of the Trust with other appropriate forms of investments such as bonds and mutual funds; and

c) failing and neglecting to invest and divest existing assets in the Trust and manage the Trust portfolio in a manner to achieve a prudent overall investment strategy, and failing and neglecting to adequately consider or achieve risk and return objectives reasonably suited to the Trust and Abramson's individual circumstances.

**COUNT I**
**BREACH OF TRUST**

27. Abramson repeats and restates the allegations in Paragraphs 1 through 26 of the Complaint as if fully set forth herein.

28. Through their acts, actions, conduct, and/or failures to act, as aforesaid, Bank of America and its predecessor Trustees, Fleet and BankBoston, breached the terms of the Trust.

29. As a direct and proximate result of the breaches of the Trust as aforesaid, Abramson has been and continues to be damaged in an amount in excess of $75,000, exclusive of interest and costs.

30. As Trustee, and as successor Trustee to Fleet and BankBoston, Bank of America is liable to Abramson for breaches of the Trust as aforesaid.

31. Additionally, or alternatively, inasmuch as Fleet has been acquired by and/or is a wholly owned subsidiary of Bank of America, Bank of America is liable to Abramson for breaches of the Trust as aforesaid.

32. There is no justiciable issue of fact or of law, and Abramson is thereby, pursuant to law, entitled to an award of her reasonable attorneys' fees.

**COUNT II**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

33. Abramson repeats and restates the allegations in Paragraphs 1 through 32 of the Complaint as if fully set forth herein.

34. Inherent in every contract, including the Trust, is the duty of good faith and fair dealing.

35. Through their acts, actions, conduct, and/or failures to act as aforesaid, Bank of America and its predecessor Trustees, Fleet and BankBoston, virtually disregarded and ignored their obligations to properly invest and manage the assets of the Trust, all the while collecting substantial fees from Abramson, and thereby breached their duty of good faith and fair dealing to Abramson.

36. As a direct and proximate result of the breaches of the duty of good faith and fair dealing as aforesaid, Abramson has been and continues to be damaged in an amount in excess of $75,000, exclusive of interest and costs.

37. As Trustee, and as successor Trustee to Fleet and BankBoston, Bank of America is liable to Abramson for breaches of the duty of good faith and fair dealing as aforesaid.

38. Additionally, or alternatively, inasmuch as Fleet has been acquired by and/or is a wholly owned subsidiary of Bank of America, Bank of America is liable to Abramson for breaches of the duty of good faith and fair dealing as aforesaid.

**COUNT III**
**VIOLATION OF THE RHODE ISLAND UNIFORM PRUDENT INVESTOR ACT, R.I. GEN LAWS §18-15-1, *et seq.***

39. Abramson repeats and restates the allegations in Paragraphs 1 through 38 of the Complaint as if fully set forth herein.

40. Pursuant to the "Rhode Island Uniform Prudent Investor Act," R.I. GEN. LAWS §18-15-1, *et seq*., the Trustees of the Trust had a duty to Abramson as the grantor and a beneficiary of the Trust to invest and reinvest as a prudent investor would, to diversify the assets of the Trust, and to otherwise comply with the prudent investor rule set forth therein.

41. Bank of America, and its predecessor Trustees, Fleet and BankBoston, violated their statutory duty to Abramson to comply with the prudent investor rule in numerous respects including, *inter alia:*

a) violating their statutory duty of care under R.I. GEN. LAWS §18-15-2, by failing and neglecting to invest and manage the Trust assets as a prudent investor would, by failing and neglecting to exercise reasonable care, skill and caution in investing and managing Trust assets, by failing and neglecting to adequately evaluate investment and management decisions respecting individual assets of the Trust in the context of the Trust portfolio as a whole and as part of an overall investment strategy having risk and return objectives reasonably suited to the Trust, and by failing and neglecting to adequately consider the relevant circumstances in investing and managing the Trust assets;

b) failing and neglecting to diversify the investments of the Trust, in violation of R.I. GEN. LAWS §18-15-3;

c) violating their duties at the inception of their trusteeships, in that they failed and neglected to adequately review the assets of the Trust within a reasonable time after accepting their trusteeships, and further failed and neglected to make and implement decisions concerning the retention and disposition of assets in order to bring the Trust portfolio into compliance with the purposes, terms, distribution requirements and other circumstances of the Trust, in violation of R.I. GEN. LAWS §18-15-4; and

d) violating their statutory duty of loyalty by failing and neglecting to invest and manage the Trust assets in the interest of the beneficiary of the Trust, in violation of R.I. GEN. LAWS §18-15-5.

42. As a direct and proximate consequence of the violations of the Rhode Island Uniform Prudent Investor Act, R.I. GEN. LAWS §18-15-1 *et seq.*, as aforesaid, Abramson was damaged and continues to be damaged in an amount in excess of $75,000, exclusive of interest and costs.

43. As Trustee, and as successor Trustee to Fleet and BankBoston, Bank of America is liable to Abramson for the violations of law as aforesaid.

44. Additionally, or alternatively, inasmuch as Fleet has been acquired by and/or is a wholly owned subsidiary of Bank of America, Bank of America is liable to Abramson for the violations of law as aforesaid.

## COUNT IV
## BREACH OF FIDUCIARY DUTY

45. Abramson repeats and restates the allegations in Paragraphs 1 through 44 of the Complaint as if fully set forth herein.

46. The Trustees of the Trust, during the tenures of their trusteeships, were charged by law with fiduciary duties and responsibilities to Abramson as the grantor and primary beneficiary of the Trust to use due care and reasonable prudence in exercising their discretion to invest and reinvest assets of the Trust.

47. By failing and neglecting to sell Enron stock in the Trust estate portfolio, by failing and neglecting to diversify Trust assets, and by failing and neglecting to prudently manage the Trust estate as aforesaid, Bank of America and its predecessor Trustees, Fleet and BankBoston, breached their fiduciary duties to Abramson.

48. As a direct and proximate result of the breaches of fiduciary duties as aforesaid, Abramson has been and continues to be damaged in an amount in excess of $75,000, exclusive of interest and costs.

49. As Trustee, and as successor Trustee to Fleet and BankBoston, Bank of America is liable to Abramson for breaches of fiduciary duties as aforesaid.

50. Additionally, or alternatively, inasmuch as Fleet has been acquired by and/or is a wholly owned subsidiary of Bank of America, Bank of America is liable to Abramson for breaches of fiduciary duties as aforesaid.

## COUNT V
## BREACH OF TRUST/ REIMBURSEMENT OF FEES

51. Abramson repeats and restates the allegations in Paragraphs 1 through 50 of the Complaint as if fully set forth herein.

52. Pursuant to the Trust, the Trustees were entitled to charge a reasonable fee for their services.

53. During the tenure of their trusteeships, Bank of America and its predecessor Trustees, Fleet and BankBoston, charged the Trust with periodic fees.

54. Bank of America and its predecessor Trustees, Fleet and BankBoston, breached the Trust in that the fees were excessive, were not warranted, and were not reasonable, where the Trustees failed and neglected to fulfill their duties and responsibilities under the terms of the Trust, failed and neglected to act in good faith, failed and neglected to abide by Rhode Island law, failed and neglected to exercise a reasonable measure of prudence in the matter of investments of the Trust, and breached their fiduciary duties to Abramson.

55. As a direct and proximate result of the breaches of Trust as aforesaid, Abramson has been damaged in an amount in excess of $75,000, exclusive of interest and costs.

56. As Trustee, and as successor Trustee to Fleet and BankBoston, Bank of America is liable to Abramson for breaches of Trust and for reimbursement of fees as aforesaid.

57. Additionally, or alternatively, inasmuch as Fleet has been acquired by and/or is a wholly owned subsidiary of Bank of America, Bank of America is liable to Abramson for breaches of Trust and for reimbursement of fees as aforesaid.

WHEREFORE, Abramson demands judgment against defendants Bank of America Corp. and Fleet National Bank in an amount sufficient to compensate her fully for all losses and damages, plus interest, costs, attorneys' fees, and such other and further relief as this Court deems meet and just.

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

**CLAIRE TENNIS ABRAMSON,**

By her Attorneys,

Karen A. Pelczarski (SJR)

Stephen J. Reid, Jr.

Karen A. Pelczarski #3357
Stephen J. Reid, Jr. #2811
BLISH & CAVANAGH, LLP
Commerce Center
30 Exchange Terrace
Providence, Rhode Island 02903
Telephone: (401) 831-8900
Facsimile: (401) 751-7542

Dated: January 21, 2005

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND
2005 JAN 21 P 1:09
FILED

(A)

EXHIBIT A

# Indenture of Trust

Between

Claire Tennis Abramson

and

Rhode Island Hospital Trust Company

SHEFFIELD & HARVEY
ATTORNEYS AT LAW
223 THAMES STREET
NEWPORT, RHODE ISLAND

The Tuttle Law Print, Publishers, Rutland, Vt.

This <u>INDENTURE OF TRUST</u> made and executed this 28th day of November A. D. 1958, by and between <u>Claire Tennis Abramson</u>, of East Patchogue, County of Suffolk, State of New York, hereinafter referred to as the grantor, and <u>Rhode Island Hospital Trust Company</u>, a corporation created by the General Assembly of the State of Rhode Island, and having its principal place of business in the City and County of Providence, State of Rhode Island, hereinafter referred to as the trustee.

<u>WITNESSETH</u>: That I, <u>Claire Tennis Abramson</u>, in consideration of the sum of one dollar ($1.00) to me in hand paid, and of the trusts hereinafter declared, do hereby give, grant, bargain, sell, transfer, assign, set over and deliver unto said <u>Rhode Island Hospital Trust Company</u>, its successors and assigns, that certain personal property, more particularly described and itemized in a receipt therefor of even date herewith, together with such further property as I or any other person may from time to time add thereto, all of said property being hereinafter referred to as the trust estate.

<u>TO HAVE AND TO HOLD</u> said property and estate, and any and all additions to said property and estate that I, the grantor, or any other person may hereafter make by will or otherwise, and whether in money, securities or other property and all investments and reinvestments thereof, and all property of every kind that shall at any time hereafter be subject to these trusts, unto said <u>Rhode Island Hospital Trust Company</u>, its successors and assigns, but in trust, nevertheless, upon the trusts and for the uses and purposes herein set forth.

The trustee shall collect the income from said trust estate and:

(1) Subject to the terms and provisions of this instrument hereinafter set forth, shall pay over to said grantor the net income from said trust estate quarterly or more often for and during her natural life. ——————————

(2) Subject to the terms and provisions of this instrument hereinafter set forth, shall pay to said grantor, until she reaches the age of forty-five (45) years, such part of the principal as said grantor may request with the approval of either her mother, Hazel W. Tennis, or her father, Matthew N. Tennis, provided, however, that if both said parents shall die before said grantor reaches the age of forty-five (45) years, she shall be entitled, on her request, to receive the sum of One Thousand ($1,000.00) Dollars each year from said principal. If the full amount of One Thousand ($1,000.00) Dollars shall not be paid in any one year, the right to the same shall be cumulative. ——————

(3) Notwithstanding any of the other terms and provisions hereof, the trustee may, in its uncontrolled discretion, pay such income, and such part of the principal hereof as it may deem necessary or proper, to or for the benefit of the grantor for her comfort, maintenance and support, and such part of the principal hereof as the trustee, in its uncontrolled discretion, may deem necessary or proper for the comfort, support, education and advancement of any of the children of the grantor, and said trustee may, in its uncontrolled discretion, make such payments of principal and income for the benefit of the grantor and to or for the benefit of the grantor's children at such times and in such amounts and proportions as it may, in its uncontrolled discretion, determine with respect to the grantor and for the comfort, maintenance, support, education and advancement of the grantor's children, even to the exclusion

of one or more beneficiaries, and the trustee shall not be required to make such payments equally or proportionally. Any apportionment at one time shall not control or affect the payments at any subsequent time. ———————————————

(4) Upon the death of said grantor the principal and accumulated income, if any, then remaining shall be then divided into as many shares as there are children of the grantor then living and children who shall have died leaving issue then living, per stirpes and not per capita. One of such shares shall be allotted to each living child of said grantor and one share to the issue of any deceased child, per stirpes and not per capita. The share of any child or issue of a deceased child who shall then have reached the age of twenty-five years shall be paid to such child or issue free and clear of any trust. The share of any child who shall not then have reached the age of twenty-five years or the issue of a deceased child who shall not have reached the age of twenty-five years shall be retained and held in trust until such child or issue of a deceased child attains the age of twenty-five years or shall die, whichever shall first occur, and the trustee shall pay the net income to or for the benefit of such child or issue of a deceased child, per stirpes and not per capita, and such part of the principal thereof from time to time in such amounts as the trustee, in its uncontrolled discretion, may deem to be necessary for the comfort, maintenance, support and education of such child or issue of a deceased child. In determining whether to make payments of principal the trustee shall take into consideration the need of such child or issue of a deceased child for funds for education, including college or professional. ———————

(5) If such child or issue of a deceased child lives to attain the age of twenty-five, the principal and undistributed

income, if any, of said share shall be paid over and transferred to said child or issue of a deceased child, per stirpes and not per capita, free and clear of any trust.

(6) If such child or issue of a deceased child dies before reaching the age of twenty-five years, then the remaining principal and undistributed income, if any, of his or her share shall be paid over to his or her issue then living, per stirpes and not per capita, if said issue shall have reached the age of twenty-one at such time, but if such issue shall not have reached the age of twenty-one years at such time, such share shall be held by the trustee in trust and the trustee shall pay the net income of the same quarterly or oftener, together with such part of the principal thereof, as the trustee may from time to time, in its uncontrolled discretion, deem necessary or proper for the comfort, maintenance, support and education of such issue, or to or for the benefit of such issue, and when the youngest of such issue shall reach the age of twenty-one, shall pay over and deliver such share to such of said issue as may then be living, per stirpes and not per capita, free and clear of any trust.

If such child or issue of a deceased child dies before reaching the age of twenty-five years, leaving no issue him or her surviving, then the remaining principal and undistributed income, if any, of his or her share or portion shall, in the case of a child, be added equally to the other shares established hereunder, and, in the case of issue, shall be added equally to the other portions of the same share from which such issue's portion was derived, if any of such issue's brothers and sisters shall be then living, or if not, then to the other shares established hereunder, including in any case shares or portions already distributed.

(7) If the grantor shall die leaving no issue her surviving, or if she and all of her issue shall die leaving any portion of the trust estate undistributed, the same shall be added in equal shares to and in all respects follow the disposition of the trust estates created by the grantor's sisters by instruments bearing even date herewith. ___________________________

(8) Notwithstanding any of the terms and provisions herein made for the payment of income and principal, if any, if any trust established hereunder has not terminated twenty-one years after the death of the survivor of the grantor, the grantor's father, Matthew N. Tennis, the grantor's mother, Hazel W. Tennis, and the grantor's children living on the date of the execution of this instrument, such trust shall terminate at the end of said twenty-one years period, and the then remaining principal and undistributed income thereof shall be paid to the grantor's children or issue, as the case may be, to whom the income payments were required to be made, such children or issue to take per stirpes and not per capita; if there are no such children or issue then living, the then remaining principal and undistributed income shall be paid to such of the grantor's sisters, namely Marilyn Louise Cosgrove and Dorothy Elaine Tennis, as are living at such time, or the issue of any who shall have deceased leaving issue, such issue to take by right of representation the share his or her parent would have taken if then living, per stirpes and not per capita. If at the time of the termination of the trust herein created there be no issue of the grantor or her sisters then living, the trustee shall transfer and pay over the trust estate in its hands to the next-of-kin of said Matthew N. Tennis according to the laws of descent and distribution of the State of Rhode Island then in force.

(9) Notwithstanding the terms and provisions heretofore set forth for the payment of principal and income during the duration of this trust, the trustee hereunder, in its uncontrolled discretion, may pay such part of the principal hereof to or for the benefit of the grantor's father, Matthew N. Tennis, and the grantor's mother, Hazel W. Tennis, as from time to time it may deem necessary or proper for the comfort, maintenance and support of the grantor's father and mother, if said trustee shall have determined that said father and mother do not have funds of their own to which they are entitled to maintain and properly support themselves. ————

(10) Where any minor under the terms and provisions hereof shall be entitled to receive any income or principal hereunder, either directly for or toward his or her comfort, maintenance, support and education, the trustee, at its option, may make payment to such minor or his or her guardian or to such other person as the trustee shall think proper, and said trustee shall not be liable to see to the application thereof. The trustee may make such payment, application or expenditures, if in its uncontrolled discretion they are reasonable and proper, and it shall not be compelled to regard or consider the ability of any other person to provide for the maintenance, education or benefit of such minor or the existence of any other fund which may be available for the purpose. ————

(11) Said grantor may, by instrument in writing delivered to the trustee, modify or alter this agreement in whole or in part, provided, however, that it shall be with the consent of her said father or mother until she reaches the age of forty-five, and said trustee shall consult Matthew N. Tennis, if living, otherwise Hazel W. Tennis, if living, about any change in investment. ————

(12) If any beneficiary under these trusts shall assign any income to which he or she is entitled, or any part thereof,

prior to its actual payment to him or her, or if from bankruptcy or insolvency or from any alienation, voluntary or involuntary, or from any other cause whatsoever, the said income or any part thereof shall, or but for this proviso would, at any time become payable to, or pass to or for the benefit of, any other person than such beneficiary, his or her right to receive such income or any income hereunder shall absolutely cease and determine; and the income which would have been payable to such beneficiary shall be added to and invested with the principal of the trust fund, or of his or her share if set apart therefrom, during the remainder of the period for which he or she would have been entitled to receive income; but notwithstanding any such assignment or other alienation and consequent forfeiture it shall be lawful for my said trustee in its uncontrolled discretion and at any time or from time to time during the period for which such beneficiary is so entitled, but without its being obligatory upon it, to pay to or apply for the benefit of such beneficiary or of his or her family so much and such part of the said income as it shall deem proper. ———————

(13) The trustee shall render to the grantor during her life an account of its acts and doings as trustee. The grantor's written approval of said account shall, as to all matters and transactions covered by said account, be binding upon all who at the time of said account, are or may thereafter become, entitled to any benefit under the same. From and after the death of said grantor, the trustee shall each year render an account of its administration of each trust under this instrument to the person or persons of full age and to the guardian or guardians of minors who may have a beneficial interest in the same. The written approval of said account by said beneficiary or the guardian of

any minor beneficiary shall be a full and complete protection to the trustee, as to all matters stated therein or shown thereby.

Said trustee shall have the following rights, privileges, powers, authorities and immunities, the enumeration of which herein shall not be deemed to exclude any which said trustee would have but for this enumeration, viz: ————————

1. The power, except as herein otherwise provided, at any time and whenever from time to time said trustee shall deem it proper, to sell, assign, transfer, convey, demise, lease, mortgage and pledge any or all of said trust estate on such terms and conditions and with such covenants, warranties and agreements as to said trustee shall seem best, and to make, execute, acknowledge and deliver any and all conveyances and other instruments that may be necessary or proper to accomplish the same, and, at any time and from time to time and particularly upon the sale or other disposition of any of said trust estate, to invest and reinvest said trust estate or the proceeds of such sale or other disposition, or to use and appropriate such proceeds in any manner that said trustee shall deem best for the protection of any other portion of said trust estate or for the benefit of said trust estate as a whole. ————————

2. The power and authority to give receipts for the purchase money of any portion of said trust estate, and for any stock, securities or other property transferred to said trustee, which receipts shall be an effectual acquittance and discharge to the person or persons paying or transferring the same. No purchaser of any portion of said trust estate and no corporation which at the request of said trustee shall transfer upon its books any of its stock standing in the name of said trustee shall be obliged to inquire into the necessity, propriety or regularity of any such sale or transfer or to see to the application of the

purchase money or in any way be responsible for the application, non-application or misapplication thereof. ___

3. In each and every case of the purchase or sale by said trustee of bonds, notes, debentures or other obligations, either at a premium above or at a discount from the face value or par value thereof, said trustee is hereby authorized in its absolute discretion in each instance: ___

(a) To credit or charge the amount of such premium or discount to either income or principal, or partly to each, in such proportions as it shall determine, or ___

(b) To amortize the premium at such rate and in such manner and at such time or times as it shall determine, or ___

(c) To disregard completely in its accounts the fact that a purchase or sale was at a premium or a discount, and ___

(d) To make different determinations in other and later instances, even though inconsistent with previous determinations. ___

4. The power and authority to exercise any right or option of subscription attached to or which may at any time belong or be given to the holders of any stocks, bonds, or other securities forming a part of said trust estate. ___

5. The power and authority to join in any plan of lease, mortgage, consolidation, merger, exchange, reorganization or foreclosure of any corporation, the stocks, bonds or other securities of which at any time form a part of said trust estate, and to take and hold any securities issued under any such plan, to pay any assessments involved therein, and to execute any and all instruments necessary or proper in the judgment of said trustee

to the accomplishment of such plan. ——————————

6. The power and authority to place stocks in voting trusts and to deposit stocks, bonds or other investments with the committee or depositary under any agreement establishing a protective or reorganization committee representing the interest of the holders of such stocks, bonds or investments and to take any and all action under or in furtherance of any such agreement which they or it may deem expedient. ——————————

7. The power and authority to treat dividends, except cash dividends paid from current earnings in the usual course of business, whether paid in cash, in stock, or in property, and to treat rights to subscribe to stock and other similar rights as either principal or income or partly as each in accordance with what shall be deemed equitable by said trustee in each case; and the decision of said trustee in each case shall be final and conclusive. ——————————

8. The power and authority to charge against and pay from the income of said trust estate a reasonable compensation for its services as trustee. ——————————

9. The power and authority in making any division or distribution of said trust estate or any part, share or portion thereof to make such division or distribution either wholly or partly in kind, that is to say in cash or securities or both, and if in securities at such valuations as in the judgment of said trustee shall be the real and fair valuations thereof at the time of such division or distribution, and its determination as to the method of division or distribution and valuation of any securities shall be final, binding and conclusive. ——————————

10. Any of the powers of discretion granted to or permitted by this instrument to be exercised by said trustee

may be exercised by, or under the authority of, any of the officers or committees of such trustee from time to time having the general charge and oversight of the estates held in trust.

11. The trustee is authorized, in its absolute and uncontrolled discretion, to hold and retain any property coming into its hands hereunder in the same form of investment as that in which it may exist at the time, so long as it may deem it advisable or advantageous so to do, and the trustee shall not be liable for any loss or depreciation occasioned by so doing. ——

IN WITNESS WHEREOF, I, the grantor, have hereunto set my hand and seal, and the Rhode Island Hospital Trust Company has caused these presents to be executed by its duly authorized officer and its corporate seal affixed, all as of the day and year above written.

Claire Tennis Abramson

Rhode Island Hospital Trust Company
By Ralph O. Udall
Asst. Trust Officer

Attest:
Signe A. Falkenholm

State of ~~New York~~ Rhode Island
County of ~~Suffolk~~ Newport

At ~~East Patchogue~~ Newport in said County and State, on this 28th day of November A. D. 1958, before me personally appeared Claire Tennis Abramson, to me known and known by me to be the person described in and who executed the foregoing instrument, and she acknowledged the said instrument by her executed to be her free act and deed.

Before me,

Signe A. Falkenholm
Notary Public

State of Rhode Island
County of Newport

At Newport in said County and State, on this 28th day of November A. D. 1958, before me personally appeared Ralph O. Udall to me personally known and known by me to be the asst Trust Officer of Rhode Island Hospital Trust Company, the party described in the foregoing instrument, and he acknowledge the said instrument by him executed in behalf of said corporation to be the free act and deed of said corporation, his free act and deed as of said corporation and his own free act and deed as well.

Before me,

Signe A. Falkenholm
Notary Public

1st Amendment

3
5-9494 900

B

Tiverton, R. I.
December 27, 1958

Rhode Island Hospital Trust Company, Trustee
286 Thames Street
Newport, Rhode Island

Gentlemen:

The trust indenture executed by me on November 28,1958 in which you are made trustee is hereby amended by striking out on page 5, paragraph (7) the fifth and sixth lines reading, "the trust estates created by the grantor's sisters by instruments bearing even date herewith" and inserting in place thereof the following, "the trust estate created by my sister Marilyn Louise Cosgrove by an instrument dated October 16, 1958 and the trust estate created by my sister Dorothy Elaine Tennis by an instrument dated November 28, 1958".

Very truly yours,

Claire Tennis Abramson

Claire Tennis Abramson

EXHIBIT B

Paula M. Murphy
Vice President

C

**Fleet Investment Advisors**

Mail Stop: RI DE 03605G
100 Westminster Street
Providence, RI 02903
401 278.6451 tel
800 439.4559 tel
401 278.6622 fax
paula_m_murphy@fleet.com

November 7, 2001

Ms. Claire T. Abramson
28 South Pine Lake Drive
Patchogue, NY 11772

Re: U/I Claire T Abramson

Dear Ms. Abramson:

I have been unsuccessful reaching you by telephone so decided to write to you. Upon review of your portfolio, I would like to suggest selling all or part of the Enron position in the above-mentioned account. Currently you own 9,088 shares of this security. It is trading at about $9.00 per share. We feel that Enron is a high risk situation due to its accounting issues and rumors of potential fraud. At this time, I would suggest investing the proceeds into a cash reserve position as well as purchasing fixed income securities. I have enclosed an investment program for your review.

Please let me know if this does not meet with your approval. If we do not hear from you we will begin reducing the Enron position in order to protect you from further downside risk. I may be reached at (401)278-6451.

Sincerely,

Paula M Murphy

Paula M. Murphy
Investment Advisor

**EXHIBIT C**

# Fleet Investment Advisors

Paula M. Murphy
Vice President

Mail Stop: RI DE 03605G
100 Westminster Street
Providence, RI 02903
401 278.6451 tel
800 439.4559 tel
401 278.6622 fax
paula_m_murphy@fleet.com

November 21, 2001

Mrs. Claire T. Abramson
28 South Pine Lake Drive
Patchogue, NY 11772

Re: U/I Claire T Abramson

Dear Mrs. Abramson:

I am writing to you in light of our conversation on Friday, November 18, 2001 at which time you reiterated that you did not wish to sell any shares of Enron Corp in your account. Although we have no authority to sell securities without your formal approval, it is the recommendation of Fleet Investment Advisors to reduce or eliminate over-weighted positions.

As we discussed, Minnesota Mining & Manufacturing is another holding that has grown to a disproportionate percentage of your account. Presently, it accounts for 36% of your equity position. It is our recommendation that this holding should also be reduced and proceeds may be best invested into fixed income assets.

If you have any questions, please do not hesitate to call me at (401) 278-6451. Thank you.

Sincerely,

Paula M Murphy

Paula M. Murphy
Senior Investment Advisor

**EXHIBIT D**

Paula M. Murphy
Vice President

E

# Fleet Investment Advisors

Mail Stop: RI DE 03605G
100 Westminster Street
Providence, RI 02903
401 278.6451 tel
800 439.4559 tel
401 278.6622 fax
paula_m_murphy@fleet.com

November 29, 2001

Mrs. Claire T. Abramson
28 South Pine Lake Drive
Patchogue, NY 11772

Re: U/I Claire T Abramson

Dear Mrs. Abramson:

Enclosed please find the lot report we discussed during our conversation on Monday, November 26th. The highlighted column represents the gain on each security that would be incurred if the security were sold on November 29th.

Also, Enron was sold in your account for net proceeds of $7,725.00. The estimated tax due on this transaction will be $1,545.00.

I would also like to reiterate that in our professional judgement, now is a good time to reduce your holding of Minnesota Mining & Manufacturing. It is our recommendation that 1500 shares be sold. 750 in 2001 and 750 in 2002. This will allow the capital gains tax to be spread over two tax years. If market conditions permit, and you do not object, I will proceed with these sales after December 10, 2001.

I will call you Monday, December 3rd to review the lot report with you and discuss any questions you may have. In the meantime, please do not hesitate to call me at (401) 278-6451. Thank you.

Sincerely,

Paula M Murphy

Paula M. Murphy
Senior Investment Advisor

EXHIBIT E